# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | GEORGE W. LINDBERG | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 2001 C 7957 | DATE | APR 30 2003 |
| CASE TITLE | Mack Boyd (IDOC # A-90977) v. T. Pork, et al. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion for summary judgment [57-1] is granted as to defendant Russell and denied as to defendants Pork and Baker, dismissing defendant Russell. Plaintiff's motion to strike affidavit of Willard O. Elyea [67-1] is denied. Plaintiff's motions for clarification [76-1] and for minute orders [79-1] are denied. The court will appoint counsel for plaintiff by separate order.

(11) ☐ For further detail see order on the reverse side of the original minute order.

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | MAY 02 2003 date docketed | | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| SLB | courtroom deputy's initials | 03 MAY -1 PM 1:22 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MACK BOYD, )
    Plaintiff, )
)
    v. ) No. 01 C 7957
)
TERRELL PORK, KENNETH BAKER, JR., ) Judge George W. Lindberg
and JONATHAN RUSSELL, )
)
    Defendants. )

MEMORANDUM OPINION AND ORDER

Mack Boyd, a prisoner in the custody of the Illinois Department of Corrections (IDOC), filed suit under 42 U.S.C. § 1983 alleging that IDOC personnel at Stateville Correctional Center had been deliberately indifferent to his health and safety in violation of the Eighth Amendment. The court initially granted Boyd leave to proceed in forma pauperis and dismissed certain defendants pursuant to 28 U.S.C. § 1915A. The three remaining defendants, correctional officers Terrell Pork and Kenneth Baker, Jr., and medical technician Jonathan Russell,[1] have joined in moving for summary judgment under Rule 56, Fed.R.Civ.P.

I. ALLEGATIONS OF THE COMPLAINT

Boyd's complaint, together with his administrative grievance, Cmplt. Exh. A, give the following account.[2] Boyd was confined in the segregation unit at Stateville Correctional Center. Early in the morning of November 29, 2000, Boyd awoke feeling thirsty, but the water was turned off in his cell. He went to the door to call for assistance, and noticed a medication package on the door flap of his cell placed there by defendant Jonathan Russell, a medical technician. Boyd called defendant correctional officer Terrell Pork over to his cell and asked him to turn on the water, and Pork said

---

[1] Boyd originally sued Russell, whom he knew as "Med-Tech Jonathan," as "Jonathan Brown." When the U.S. Marshal was unable effect service, counsel was appointed for Boyd to identify and locate this defendant. Counsel was thereafter permitted to withdraw.

[2] Boyd's amended complaint filed by his appointed counsel is a typed version of the original complaint containing no new allegations. Appended as exhibits to the amended complaint are copies of Boyd's original complaint, a page from Boyd's medical records, Boyd's administrative grievance filed January 16, 2001 from Dixon Correctional Center, and responses from IDOC's Administrative Review Board, including the final denial of Boyd's grievance on April 11, 2001.

he would. Boyd then asked Pork whether the medication package was his. Pork asked Boyd's name and identification number. Boyd told him, and Pork handed the package into Boyd's cell.

When Boyd looked at the package, he saw the medication was intended for another inmate. Boyd was angry because this was the second time in five days that he had received someone else's medication. Boyd had recently been returned to segregation after a suicide attempt; feeling that nobody cared whether he lived or died, Boyd impulsively swallowed the contents of the package, six tablets of Verapamil, a high blood pressure medication.

It is unclear from the complaint and grievance what happened next. Boyd's grievance states that he informed defendant Russell and defendant Baker, as well as an unnamed lieutenant and an unnamed captain, but "it took them from before lunchtime on Nov. 29, 2000 until around shift change at 3:00 p.m. on Nov. 29, 2000 to get me over to the hospital." Boyd does not state when he told each of these persons that he had swallowed the tablets and needed medical care. Boyd alleges in his grievance that in order to receive medical attention he scratched his wrist on the window of his cell and made preparations to hang himself by tying his sheet to a light fixture. He was finally taken to the prison health care unit where his stomach was "flushed out" and he was kept overnight.

## II. APPLICABLE LAW

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255; *Outlaw v. Newkirk*, 259 F.3d 833, 836-37 (7th Cir. 2001).

Nevertheless, there is a genuine issue to be tried only if the nonmoving party presents evidence that, if believed, would support a verdict in his favor. *Anderson*, 477 U.S. at 248; *Outlaw*, 259 F.3d at 837. It is up to the nonmoving party to identify evidence precluding summary judgment; it is not the court's task to scour the record in search of genuine issues of fact. *Brasic v. Heinemann's, Inc.*, 121 F.3d 281, 285 (7th Cir. 1997).

2

The Eighth Amendment forbids cruel and unusual punishment; it does not forbid negligent conduct resulting in injury. Although negligence can support a state-law tort claim, federal jurisdiction here depends on the existence of a constitutional deprivation. This case may proceed to trial only if there is evidence that, if believed, would show that Boyd was injured because at least one defendant was deliberately indifferent to a serious risk to his health or safety -- that he knew that Boyd faced a substantial risk of serious harm and failed to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

Suicidal death obviously qualifies as serious harm, and deliberate indifference to a serious risk of suicide can violate the Eighth Amendment. *Cavalieri v. Shepard*, 321 F.3d. 616, 2003 WL 464868 (7th Cir. 2003) (applying Eighth Amendment standard to Fourteenth Amendment claim brought by estate of deceased pretrial detainee); *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001).

Likewise, deliberate indifference to an prisoner's serious medical condition violates the Constitution. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). A "serious medical need" is a condition that has been diagnosed by a physician as mandating treatment or that even a layperson would recognize as requiring a doctor's attention. *Wynn*, 251 F.3d at 593. The Eighth Amendment can be violated by deliberate and unreasonable delay in providing medical care as well as by outright denial. *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

## III. ANALYSIS

In support of their motion, defendants have submitted their own affidavits and an affidavit by Dr. Willard Elyea, Medical Director for IDOC.[3] Defendants have also submitted excerpts from Boyd's deposition and relevant portions of Boyd's medical records.

Boyd has submitted a "reply" to defendants' motion (a sort of counter-motion) together with a statement of contested facts, a memorandum of law, four of his own affidavits (three "counter-

---

[3] Boyd has moved the court to strike Dr. Elyea's affidavit because Dr. Elyea is not a party and because the affidavit is hearsay. There is no requirement that affidavit testimony submitted in connection with a motion for summary judgment be given only by parties. An expert opinion, by definition, consists of the witness's own understanding and conclusions and cannot be hearsay. It may be *based* upon hearsay, in this case Boyd's medical records, but (a) under Rule 703 of the Federal Rules of Evidence, records used as the basis for an expert opinion need not be themselves admissible; (b) they would be admissible under the hearsay exception for regularly-kept records, Rule 803(6).

3

affidavits" responding to affidavits offered by the defendants and a supplemental affidavit), medical records, and excerpts from his deposition.[4]

Boyd has responded to each paragraph of the defendants' statement of uncontested facts, but has not submitted additional facts as permitted by Local Rule 56.1(b)(3).[5] Boyd's responses often do not give specific references to affidavits and supporting materials as required by Local Rule 56.1(b)(3). References such as "see memorandum," "see plaintiff's memorandum and documentation" or "see deposition" are unacceptable. *See Brasic*, 121 F.3d at 285. Because Boyd is unrepresented by counsel the court will not hold Boyd strictly to the rule, but Boyd cannot complain if the court fails to locate an unspecified reference to Boyd's materials.

### A. Serious Medical Need

Defendants dispute that Boyd had an objectively serious medical condition. At least for purposes of this motion, defendants do not dispute that ingesting the tablets would have endangered Boyd's life had he not received treatment. Defendants nevertheless take the position that because Boyd never exhibited clinical symptoms of Verapamil poisoning he did not have an objectively serious medical need requiring treatment and hence has no claim. There is a flaw in this analysis, however.

Dr. Elyea's affidavit states that he reviewed Boyd's medical records and found no symptoms of Verapamil poisoning, which he listed as a significant decrease in blood pressure and heart rate, dizziness, weakness, chest pain, shortness of breath, fainting, and slurred speech or confusion. These symptoms would have been expected to become manifest within four to twenty-four hours after ingestion, depending on the individual. Elyea Aff., Def. Exh. 5, ¶¶ 9-10. Boyd's subjective complaints of abdominal cramping, dizziness or profuse sweating do not appear in the medical records, although they would have been noted, and in any event these are non-specific complaints not associated with an overdose of Verapamil. *Id.* ¶¶ 11-13. Dr. Elyea opines that, to a reasonable degree of medical certainty, during the twenty-four hours immediately following Boyd's admission to the health

---

[4] Boyd also furnished defendant Pork's answer to the complaint and IDOC's responses to his grievance, but these are irrelevant to the present motion.

[5] Boyd was provided with copies of Rule 56 of the Federal Rules of Civil Procedure and this court's Local Rule 56.1, as well as the notice to *pro se* litigants required by Local Rule 56.2.

4

care unit he was never in distress and showed no objectively measurable evidence of an overdose of Verapamil. *Id.* ¶ 21.[6]

Defendants point out that none of the defendants (or anyone else) saw Boyd swallow the tablets, raising the inference that he never actually swallowed them. Nevertheless, Dr. Elyea does *not* opine that Boyd did not swallow the tablets, but only that "it cannot be conclusively stated whether Boyd ingested six (6) 240 milligram tablets of Verapamil." *Id.* ¶ 4.

Dr. Elyea's circumspection is explained by the fact that ingestion of a drug produces symptoms only if and when it enters the bloodstream. Although Dr. Elyea notes that the records do not show that Boyd's stomach was pumped (Boyd used the word "flushed"), *id.,* ¶ 20, they *do* show that "[Boyd] was given medical treatment in the E.R. -- ipecac, with results." *Id.,* Exh. 1 at 3. Ipecac is a powerful emetic given to empty the stomach in cases of suspected poisoning. Although Boyd asserts that hours passed between his ingesting the tablets and his being taken to the health care unit, Boyd was highly agitated at the time, which could have delayed the normal passage of stomach contents into the small intestine. A jury could find that Boyd swallowed the tablets and consequently had a serious medical condition requiring treatment, even if treatment ultimately prevented symptoms of Verapamil poisoning.

This leaves two elements of Boyd's case against each defendant: whether each defendant was deliberately indifferent to that risk, and what injury resulted from it.

---

[6] Dr. Elyea does not testify that Boyd's blood pressure readings were normal. Although he states that normal systolic and diastolic blood pressure should be *less* than 130 and 85 millimeters of mercury, respectively, Elyea Aff. ¶ 15, but it is clear from Elyea's testimony that Verapamil causes a drop in blood pressure, so the question here is whether Boyd's blood pressure was too low, not too high. Nevertheless, nothing in the record indicates that Boyd's blood pressure was so low as to be a serious cause for concern.

Boyd disputes that he did not have a significant drop in blood pressure, stating that "my blood-pressure kept dropping down to a low-level and then it would rise. I was told this was because of distression [sic], which I didn't know." Boyd Aff. (Elyea) ¶ 3. He also disputes Elyea's assertion that his blood pressure was "stable." But Boyd does not state what his blood pressure was at any particular time, or how he knows what his blood pressure was, apart from the notations in his medical chart.

5

## B. Deliberate Indifference

### 1. Defendant Pork

Defendant Pork states in his affidavit that he was aware of verbal suicide threats made by Boyd prior to November 29, 2000, but had not known Boyd "to have ever taken any action in furtherance of any verbal suicide threat I directly overheard" Pork Aff., Def. Exh. 3, ¶¶7-8. Pork "never observed any overt action" indicating any inclination to commit suicide, and had no knowledge of whether medical personnel considered Boyd a "genuine suicide risk." *Id.* ¶¶9-10. He did not have access to Boyd's medical or mental health files. *Id.* ¶¶11-12. Boyd "never informed [Pork] on or prior to November 29, 2000, that he would try to commit suicide if he was given another inmate's medication." *Id.* ¶13. Pork testifies that he "never believed that he [Boyd] was a genuine suicide threat," based on "occasions of Boyd making unsubstantiated threats of suicide." Pork testified that he has limited medical training, does not know the effects of Verapamil, and does not know whether it could cause illness or death if not used properly. *Id.* ¶¶4-5.

Although deliberate indifference is subjective, a defendant's own testimony that he was subjectively unaware of a substantial risk of serious harm is not enough for summary judgment if a jury could find otherwise from the evidence in the record. *See Cavalieri*, 321 F.3d at ___, 2003 WL 464868 at **4. An affidavit is given under penalty of perjury, but avoiding perjury may require less than the whole truth. Pork's affidavit is drafted to place him in the best possible light, but Pork is the moving party and the court cannot ignore the shadows. Pork does not deny the crux of Boyd's complaint -- that he handed Boyd a packet of medication knowing it was intended for another inmate, creating not only a risk that Boyd would take the medication, but that the inmate for whom it was intended would not receive it.[2/] This can only be called reckless.

Did Pork know that there was a risk of serious harm? Pork may not have known the effects of Verapamil, or what dose would be lethal. But a jury would find it unlikely that Pork did not know that many medications are dangerous in excess of the prescribed dose, particularly for someone for whom they were never prescribed. A correctional officer will not be liable if he remains ignorant of

---

[2/] Pork denied this allegation in his answer, but an unsworn statement is not treated as evidence under Rule 56(e), Fed.R.Civ.P.

an obvious risk -- but the obviousness of the risk will support a finding that he was not ignorant of it. *Farmer*, 511 U.S. at 842-43.

Could a jury infer that Pork knew it was a *substantial* risk? Pork admits he knew that Boyd had threatened suicide. Pork testified that he did not believe Boyd was a "genuine" suicide risk, but does not state what lay behind that belief, other than the fact that Boyd had not succeeded in killing himself. Pork asserts he did not know that Boyd had ever acted upon "any verbal suicide threat I directly overheard," leaving open the possibility Pork knew that Boyd had acted on threats he had *not* directly overheard. Boyd testifies that Pork had seen him attempt suicide and had once taken him to the hospital after a suicide attempt. Boyd Aff. (Pork) ¶4.

According to Pork, Boyd never told him he would attempt suicide if given another inmate's medication. But the question is not what Boyd told Pork, it is what Pork thought Boyd might do. Pork has not suggested any constructive purpose that might have motivated him to give Boyd six Verapamil tablets, and Boyd testified that Pork told him, "go ahead, kill yourself, I don't care." *Id.*, ¶3.

It is well known that some suicide attempts are not intended to be lethal and are made to attract attention or sympathy. But it is equally well known that occasionally such attempts succeed. A person may act impulsively with lethal intent and repent a moment later. Repentance is more likely to be lifesaving if the would-be suicide has chosen pills rather than a method more immediately lethal, but the risk of death is nevertheless both real and intended.

Even if Pork had believed that Boyd was only capable of staging a suicide attempt to draw attention to himself, the possibility that Boyd would swallow the tablets and immediately call for help could be found to be a serious risk. There was no guarantee of a quick response to an immediate demand for medical attention, creating a risk that Boyd would kill himself even if he hadn't intended to. A jury could find that in giving Boyd the medication packet he was deliberately indifferent to a serious risk of harm.

Boyd may also have a claim against Pork for denying him medical attention. Although not mentioned in either the complaint, Boyd's response to defendants' statement of uncontested facts, or Boyd's affidavits, it appears from portions of Boyd's deposition testimony offered by defendants that

7

after swallowing the tablets Boyd called Pork back to his cell and told him what he had done, but Pork walked away and did not call for medical attention. See Def. Exh. 4 at 27, 29.

### 2. Defendant Russell

Boyd alleged that Russell placed another inmate's medication on the door flap of his cell. Russell denied this in his affidavit, Russell Aff., Def. Exh. 2 ¶ 12; Boyd responded by asking if Russell didn't put it there, who did? Plf. Rule 56.1(b) Statement ¶ 75. This does not meet Boyd's burden of coming forward with contrary evidence.

Boyd has not testified that he saw Russell put the package on the door. Boyd apparently infers that Russell placed it there because he was the medical technician on duty and it would have been his job to deliver medications to inmates' cells, escorted by a correctional officer. See Boyd Aff. (Supp.) ¶¶ 5-6; Boyd Aff. (Pork) ¶¶ 2,3,6. But even if a jury could find that Russell placed the packet on Boyd's cell door flap, Boyd has offered no evidence to show that Russell knew he was giving Boyd someone else's medication. A jury could find only negligence, which would not support an Eighth Amendment claim. *Farmer*, 511 U.S. at 835-36; *Wynn*, 251 F.3d at 593.

Boyd asserts that Russell knew that Boyd was a suicide risk, but this knowledge would not convert negligence into deliberate indifference. Russell's placing another inmate's medication on the door of a known suicide risk would still be no more than negligence, unless Russell actually knew it was the wrong medication. Boyd offers no evidence that he did.

Boyd's claim that Russell denied him medical care after Boyd told him that he had swallowed the tablets is also not supported by the record. According to Russell's affidavit, he responded to a request for medical attention from Boyd. Boyd told him that he had taken six 240-milligram Verapamil tablets. Russell examined Boyd, beginning by asking Boyd a series of questions to determine whether he was oriented and aware, which Boyd answered appropriately. Russell took Boyd's "vital statistics" (he does not state what they were) and observed that Boyd was "boisterous and energetic" and "did not indicate any medical distress or symptoms of over-dose." Russell Aff. ¶¶ 14-19. Russell asked to see the medication package, but Boyd refused to give it to him. *Id.* ¶¶ 20-21. Although he did not believe Boyd was in any danger, "pursuant to protocol," Russell "made preparations to have [Boyd] transferred to the Health Care Unit." *Id.* ¶¶ 22-23.

8

Boyd disputes that he was "boisterous and energetic" and that he answered Russell's questions appropriately. Boyd can testify as to his own condition, but while this creates a dispute of fact, it does not create a dispute of *material* fact. A material fact is one that makes a difference. *Outlaw*, 259 F.3d at 840. Because Russell had Boyd taken to the health care unit anyway, it does not matter whether or not Boyd was actually in distress or whether Russell perceived him to be. The evidence in the record does not show that Russell caused Boyd's medical treatment to be delayed or denied.

The court notes a troubling inconsistency between Boyd's admission that Russell immediately sent him to the health care unit after examining him and Boyd's statement in his grievance that Russell denied him medical care. Boyd's statement in the grievance is unsworn and of no evidentiary value. Nevertheless, Boyd's supplemental affidavit indicates that Russell was present when Boyd initially announced to Pork that he had swallowed the tablets, and Boyd states that "they left my cell" and "they did [not] do anything." Boyd Aff. (Supp.) ¶¶ 5-10. If true, this would amount to a separate claim against Russell.

Nevertheless, this possibility does not defeat Russell's summary judgment motion. If this separate, earlier encounter with Russell took place and was deliberately omitted from defendants' statement of undisputed facts, it was incumbent upon Boyd to raise it in his response to the statement. Boyd did not do so. Nor did Boyd mention it in his affidavit responding to Russell's affidavit, nor in his memorandum of law. Boyd may have realized that he had only assumed that Russell was with Pork, and could not testify that Russell had been close enough to his cell door to hear what he said to Pork. (Cell doors in the segregation unit are solid, with ports that can be opened from outside the cell. See Boyd Dep., Def. Exh. 4, at 61, Pork Aff. ¶ 17.) Whatever the reason, any such claim has been waived, and Russell is entitled to summary judgment.

### 3. Defendant Baker

In his affidavit, Baker admits that he was a correctional officer assigned to the segregation unit at Stateville on November 29, 2000, and was acquainted with Boyd. Baker denies, however, having had any knowledge of the contents of Boyd's medical or mental health files, prior suicidal threats or acts on Boyd's part, whether medical personnel considered Boyd a genuine suicide risk, and the effects of Verapamil. Baker testifies that Boyd never told him that he would try to commit suicide if given

9

another inmate's medication, and never told him that he had ingested six Verapamil tablets and wanted medical attention. Baker "do[es]s not recall any occasion with Boyd on November 29, 2000 in which the inmate appeared to be seriously ill or in need of medical attention."

These statements, even uncontroverted, would not show that Baker is entitled to judgment as a matter of law. What Baker does *not* recall, of course, proves nothing. Baker's contrastingly precise recollection, that Boyd never told him that he had ingested six Verapamil tablets and wanted medical attention, does not exclude the possibility that Boyd asked for medical attention without naming the drug he had taken. Baker's lack of knowledge of Boyd's suicidal propensities is relevant but hardly dispositive. A jury would not be compelled to find that Baker was not deliberately indifferent because he had no reason to believe Boyd would poison himself until Boyd told him he had done so.

Boyd responded in his counter-affidavit as follows:

[C]orrectional Officer Kenneth Baker worked my housing unit and had fed lunch. While feeding I informed Kenneth Baker that I had ingested some medication and I was cramping and feeling oozy. That I begged this officer to get me medical attention. This officer also worked with C/O [Correctional Officer] Pork and should have known that I was suicidal that I was in need of medical attention. This C/O K. Baker did not get me medical attention after I took the pills.

Boyd Aff. (Baker) ¶ 2. Boyd also testifies that "C/O Baker came to my cell to feed chow and I informed him that I need to get to a doctor my stomach was cramping and my head was burning. Mr. Baker did not do anything for me." Boyd Aff. (Supp.) ¶ 11.

Boyd admitted at his deposition that he did not know whether Baker did anything to obtain medical care for him. Boyd Dep., Def. Exh. 4 at 61. Nevertheless, it is reasonable to infer that Boyd did not receive medical attention within a reasonable time because Baker did not request it.

The court may not decide questions of credibility in ruling on a motion for summary judgment and must accept that Boyd told Baker he had "ingested some medication," felt ill, and wanted to see a doctor. Baker was not required to believe what Boyd said, a jury will not be required to believe that Baker believed it, or even that Boyd said it, but, depending on whom jurors believe, a jury could believe that Boyd said it, Baker heard it, Baker believed Boyd was sick, and did nothing. That is enough to avoid summary judgment.

10

## C. Injury

In a case such as this there is no claim without an injury. *Niehus v. Liberio*, 973 F.2d 526, 531-32 (7th Cir. 1992). Defendants assert that Boyd has no ongoing problems he attributes to the alleged overdose of Verapamil, Def. Rule 56.1(b) Statement ¶ 18, and, inconsistently, that Boyd has no medical evidence that the headaches he does attribute to it are caused by it.[8/] *Id.* ¶¶ 16, 17. Nevertheless, defendants do not contend that Boyd has suffered no compensable injury at all, and a jury could award damages in the absence of sequelae.

## IV. CONCLUSION

Defendants' motion for summary judgment is granted as to defendant Russell and denied as to defendants Pork and Baker. As it appears that a trial will be necessary, the court will enter a separate order appointing counsel to represent Boyd.

IT IS SO ORDERED.

George W. Lindberg,
Senior District Judge

DATED: April 30, 2003

---

[8/] Defendants did not request a Rule 56(d) finding that Boyd's headaches were not caused by the incident, and Dr. Elyea's affidavit did not address the issue.

11